DELL TITTERINGTON V. STATE OF NEBRASKA.

FILED JANUARY 5, 1907. No. 14,651.

1. Evidence examined, and *held* sufficient to sustain the verdict.

2. Rulings of the trial court upon the introduction of evidence and the giving and refusal of instructions examined, and *held* not prejudicial to the defendant.

ERROR to the district court for Lincoln county: HANSON M. GRIMES, JUDGE. *Affirmed.*

*J. G. Beeler* and *A. Muldoon,* for plaintiff in error.

*Norris Brown, Attorney General, W. T. Thompson, L. E. Roach* and *Wilcox & Halligan, contra.*

LETTON, J.

This is the second time this case has been before this court. Upon a former appeal the judgment of the district court was reversed for the refusal to give an instruction requested by the defendant. A new trial has been had and the defendant has again been convicted, from which judgment he appeals.

The defendant contends that the evidence in the case is insufficient to sustain a verdict of conviction. The evidence shows that Bentley, the prosecuting witness, had delivered certain cattle to the defendant to be pastured at an agreed price; that part of the cattle had been returned by the defendant; that part of them had died, leaving five animals in the defendant's hands which he had not accounted for. The prosecuting witness testifies that he never consented to the conversion of these cattle by the defendant, and that the same have not been returned to him. On the other hand the defendant testifies that in October, 1903, Bentley purchased a mare from him for $125; that no time was fixed for the payment of the money and that no note was taken for it; that on August 27,

1904, the defendant, with one Hostetter and Etchinson, and the restaurant keeper, Otto Weil, were in the Vienna restaurant at North Platte, Nebraska, when Bentley came in; that they had a conversation there with reference to the amount owing from Bentley to him for pasturage, and that it was there agreed that Titterington should apply the value of the five head of cattle in his possession upon the amount Bentley was owing him for the horse. Since the main controversy in the case is as to whether or not there was a settlement between the parties at this time whereby the title to the cattle passed to Titterington, it is necessary to scrutinize the testimony as to this conversation very closely. Titterington testifies that he, Etchinson and Hostetter were in the restaurant at dinner; that "Bentley came in, and he asked me, as usual, how much he owed me yet. I told him that I did not know. He said: 'How much do I owe you on the pasture bill?' I told him that I did not think the pasture bill was very big, but that he still owed me for the mare. He said his horses were knocked out; that his crop had been knocked out, and that he did not know when he would ever get the money to pay it. I asked him if he would turn the remainder of these cattle on the account. He said he would. Q. What if anything was said about the mare? A. Nothing, only my remark that there was not much upon the pasture bill and that the mare was back yet, and I asked him to turn the five head of heifers on the whole account. * * * Q. Have you related the whole conversation with reference to what took place there in the Vienna restaurant? A. In regard to the trade, I think I have. Q. As to the trade, that you took in the heifers on the account that was due you for pasturage on the cattle? A. Yes, sir."

Hostetter testifies: "Bentley came in there, and asked Titterington how much he owed him, and Dell told him he did not think the pasture bill was very much. He asked him something about a horse. I do not remember exactly what he did say, and Dell asked him about turning those

cattle over to him that was up there upon the hill, and he said: 'All right.'" He further testifies that they were still talking when he went out. Etchinson says: "We were in there eating dinner, and Bentley came in, and sat down opposite him, and asked him how much he owed him. Titterington says: 'I don't know how much it is exactly.' Q. Go ahead and tell what you heard. A. He spoke about those cattle then. Bentley says: 'Have you got the five head of cattle yet?' And Titterington says: 'Yes.' Titterington says: 'We can just turn them on this.' And Bentley says: 'Yes.' Q. Do you recollect anything further that was said there? A. No, sir." He further testifies that he remained there after Hostetter went out. Otto Weil, the restaurant keeper, testifies that he remembered of Titterington and the others being in his place in August, 1904, and heard some talk about cattle, but could not state what was said. This is all the evidence to support the defendant's contention that the title to the cattle passed from Bentley to him. Bentley admits that he was present at the restaurant at about this time, and thinks they had a talk about the cattle, but did not think they spoke about the pasture bill. He denies positively that he ever bought a mare from Titterington, and testifies that he did not remember of Titterington making the statements in the restaurant testified to by him. He further testified upon rebuttal, when asked if in the conversation at the Vienna restaurant, or any other time, he said to Titterington that he would sell him the cattle to apply on the payment of the mare. "No, sir, as I said before, I have no recollection of anything of the kind. I cannot see why I could agree in any such way. I never owed Titterington for any mare or any horse at any time. Q. Did you ever sell these cattle to Titterington? A. As I said today, I do not remember ever selling any cattle to Titterington. Q. Did he ever pay you for them? A. No, sir." Roy Spurrier testified that about October 10, 1904, he asked Titterington what had become of the Bentley cattle, and he said that he had hid them; that Bentley owed him for a horse,

and that whenever Bentley paid him what he owed him he would get him the cattle or some others in place of them. George Garman testified that in December, 1904, he went to Titterington's house to see him about some cattle they were short of, and that in the conversation Titterington said: "The only crooked work I have done is I stole the Bentley cattle and killed them. He owed me some money and he would not pay it, and I just took the cattle." Upon cross-examination the witness would not swear positively that Titterington used the word "stole," but he was positive that he used the words "crooked work," with reference to the Bentley cattle. This witness is corroborated by his brother Frank Garman, who was with him at the time. Other witnesses testified that Bentley went to Titterington's place, and bought the mare which has been spoken of, while Bentley and one Mrs. Ingersoll testified that Mrs. Ingersoll bought the mare early in October, 1903, to match another horse she owned, and that she sent Bentley to Titterington's place to get the mare later in the month, at the time when the defendant's witnesses testified they saw him there driving the mare.

In this state of the testimony it is apparent that, if the jury believed the witnesses for the state, there was sufficient evidence to sustain the verdict. It is also clear that the jury were not impressed with the veracity of the witnesses for the defendant. If they had given them any credence, there was a sufficient volume of testimony, not only to raise a reasonable doubt, but to convince them of the defendant's innocence. It is impossible for this court to say from the cold pages of the transcript which of these witnesses should have been believed, and it is not our province so to do. The matter was exclusively for the jury to determine, and with their conclusions upon the facts we are not disposed to interfere.

Error is assigned for the refusal to give an instruction to the effect that, if the defendant honestly believed he had a right to butcher or ship the cattle, under the con-

tract of purchase made with Bentley, then the jury should find the defendant not guilty. This assumes there was a contract of purchase, which is the point in dispute, but if it be construed as submitting that question to the jury, it was not so favorable to the defendant as the one given by the court on its own motion. The court instructed the jury that, if the evidence showed a settlement, or if it was sufficient to raise in their minds a reasonable doubt as to whether or not the defendant and Bentley had a settlement of their accounts whereby the defendant became the owner of the cattle, they should give the defendant the benefit of the doubt, and acquit him. It is clear that the jury must have entirely disbelieved the testimony of Titterington, Hostetter and Etchinson as to what took place in the restaurant, otherwise this instruction must have resulted in the defendant's acquittal, and it was as favorable to him as the evidence warranted.

Other errors are assigned with reference to the refusal of other instructions and to the rulings of the court upon the introduction of testimony. We have examined these instructions and the rulings as to the evidence, and find nothing prejudicial to the defendant.

Lastly, the instruction given by the court upon the question of reasonable doubt is assailed as being prejudicially erroneous. The instruction is prolix and unwieldy, and no doubt it would have been better to have omitted it entirely or to have given a short and clear instruction upon that point. We have often criticised the practice of the district courts in giving long instructions attempting to define reasonable doubt, and think the instruction under consideration was entirely too long to serve a good purpose. However, we find no erroneous statement of the law therein, and certainly find nothing which is prejudicial to the defendant. The defendant appears to have had a fair and impartial trial. His rights were properly protected by the court in its instructions to the jury.

The judgment of the district court is therefore

AFFIRMED.